UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL No. 23-10293-LTS |
| TRAMONTE JAMIER QUEEN | |
| Defendant | |

**GOVERNMENT'S OPPOSITION TO MOTION TO COMPEL DISCOVERY**

The United States of America, by Leah B. Foley, United States Attorney, and Brian A. Fogerty and Jessica L. Soto, Assistant United States Attorneys for the District of Massachusetts, opposes, in part, defendant Tramonte Jamier Queen's motion to compel discovery. ECF No. 150.

Queen makes seven discovery requests. They fit within three categories: (1) material that Queen claims will support his yet-to-be-filed motion to dismiss alleging vindictive prosecution; (2) material that relates to the search of his cell phones; and (3) miscellaneous material that he contends is discoverable pursuant to Fed. R. Crim. P. 16. While there are certain items—specifically identified below—the government agrees to produce, the Court should deny the balance of Queen's motion because Queen requests material that is not discoverable under Rule 16 or any of the government's other discovery obligations.

<u>First</u>, the Courts should deny the requests that relate to Queen's baseless allegation of vindictive prosecution. This includes the requests for correspondence regarding the discovery of child sexual abuse material (No. 3) and grand jury transcripts and audio recordings (No. 6). Queen generally alleges that the government sought a superseding indictment, adding CSAM production charges that carry a 15-year mandatory minimum, to punish Queen for proceeding to trial. In

support of this allegation, Queen cites the timing of the superseding indictment and the fact that the government was previously aware that Queen's devices contained CSAM depicting Victim 2. He does not cite the governing standard for such a claim. Nor does he cite any case law supporting his requests.

The government denies Queen's allegation of harboring an improper motive for adding charges related to Queen's repeated sexual exploitation of 17-year-old Victim 2. The government's conduct has been consistent with its ethical obligations and the governing law. As a threshold matter, "[i]n our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). Indeed, the Supreme Court has long held that a defendant carries a high burden to demonstrate vindictiveness in the pretrial setting. *See United States v. Goodwin*, 457 U.S. 368, 381 (1982). And, here, the Supreme Court in *Bordenkircher* and the First Circuit have held that the specific bases for Queen's misconduct allegation are not circumstances that establish a vindictive prosecution claim. *See Bordenkircher*, 434 U.S. at 359-363 (holding no vindictive prosecution where the prosecutor possessed the evidence to support the added charges at the outset and superseded after the defendant rejected a plea offer); *see also United States v. Bucci*, 582 F.3d 108, 113–14 (1st Cir. 2009) (citing *United States v. Roach*, 502 F.3d 425, 444–45 (6th Cir. 2007) (rejecting argument that the fact that the Government could have brought charges initially, but did not do so, indicated the prosecutor's vindictiveness) and *United States v. Cooper*, 461 F.3d 850, 856 (7th Cir. 2006) ("[E]vidence of suspicious timing alone does not indicate prosecutorial animus.")); *see also United States v. Young*, 955 F.2d 99, 108 (1st Cir. 1992) (same).

More importantly for Queen's discovery motion, a misconduct allegation with scant support does not authorize the type of discovery he seeks. *See Bucci*, 582 F.3d at 113–14. And, even if it did, Queen's underlying rationale for the disclosure of grand jury material—i.e., his pure speculation that the government failed to disclose purported exculpatory information to the grand jury—cannot support a motion for disclosure of grand jury transcripts and recordings. *See United States v. Williams*, 504 U.S. 36, 55 (1992) (holding that the Court may not impose upon the government an obligation to present exculpatory information to the grand jury); and *United States v. Fontanez*, No. 19-10421-DJC, 2023 U.S. Dist. LEXIS 141256 at *40–42 (D. Mass. Aug. 14, 2023) (denying motion to disclose grand jury transcripts because failure to disclose exculpatory information to grand jury is not a basis for a motion to dismiss an indictment). Consistent with Supreme Court and First Circuit precent, the Court should reject Queen's spurious claim and deny his request for discovery on this issue.

<u>Second</u>, the government does not oppose Queen's request to review the extractions from his cell phones (No. 4) and the partial extracted data from Victim 1's phone (No. 5). Queen's cell phone extractions have been available for counsel's review since the government provided its automatic discovery letter on January 25, 2024, in which it invited counsel to inspect the CSAM-containing devices at FBI. Since that time, Queen's counsel has reviewed the extractions once at the FBI. And counsel reviewed the extractions a second time with Queen present at the U.S. Attorney's Office on October 28, 2025. The government has no objection to providing copies of the general parameters of the data extracted from Queen's or Victim 1's respective devices.

<u>Third</u>, the government does not oppose certain aspects of Queen's miscellaneous requests. Of course, the government does not oppose Queen's request for information regarding whether the defendant was the subject of an investigative identification procedure, pursuant to Local Rule

116.1(c)(1)(F).  *See* Request No. 1.  Indeed, the government provided that information in its automatic discovery letter dated January 25, 2024, and again in an email and report on or about October 27, 2025, which was within 24 hours of Victim 1 identifying Queen and Victim 2 in one of the charged CSAM videos.

The government does object to creating additional material to make the same type of disclosure for every single trial witness's identification of anyone else other than the defendant (No. 1).  To the extent witnesses identified themselves or others and that information is contained in reports or records, the government has already produced them.  Fed. R. Crim. P. 16 does not require the government to create more reports documenting the circumstances of any identification of which the defendant was *not* the subject.  *See, e.g., United States v. Cameron*, 672 F. Supp. 2d 133, 137 (D. Me. 2009) ("Rule 16(a)(1)(E) 'by its terms is directed to materials that the government actually possesses' and does not apply to a document until it is created.  The Court is unaware of any authority that would require the Government to manufacture a document in order to respond to a Rule 16(a)(1)(E) document request") (citation omitted).  Queen cites no authority supporting imposition of this additional discovery obligation.

The government does not oppose Queen's request for material demonstrating Victim 1's familiarity with commercial sex in connection with the report bates-labeled 1428, if such material exists and is in the government's possession, custody, or control.  *See* Request No. 2.[1]  However, the government does not concede that such information, if it exists, is the proper subject of impeachment or otherwise admissible.  Generally, a minor victim's participation in commercial sex prior to the charged offense is inadmissible under Fed. R. Evid. 412(a).

---

[1] Material and information held by the Massachusetts Department of Children and Families is not within the government's possession, custody or control.  This state child welfare agency is not part of the prosecution team.

Finally, the government does not oppose Queen's general request for assistance reviewing and obtaining exhibits from the cell phone extractions that contain CSAM. So far, the government has facilitated defense counsel's review of these extractions on two occasions: at FBI and at the U.S. Attorney's Office. The government has also facilitated Queen's personal review of these extractions (and Apple iCloud data) with his two attorneys at the U.S. Attorney's Office. However, pursuant to the Adam Walsh Act (18 U.S.C. § 3509(m)), as a matter of law, the government cannot permit defense counsel to obtain unreviewed data from the extractions because that data could contain CSAM (No. 7). Therefore, the government proposes permitting Queen's attorneys and/or investigator to select and copy non-CSAM data to be used at trial. This would be done at an FBI facility. An FBI agent or task force officer will review the selected data simply to ensure that it does not include any CSAM images or videos.

**Background**

A.    **Procedural History.**

    i.    The State Charges.

Boston Police arrested Queen on February 5, 2022. Subsequently, he was charged with state trafficking and other offenses in Suffolk County Superior Court. The state charges included: Trafficking a Person for Sexual Servitude, in violation of Mass. Gen. Laws ch. 265, § 50 (targeting Victims 1 and 3); Kidnapping, in violation of Mass. Gen. Laws ch. 265, § 26 (Victim 3); Assault & Battery, in violation of Mass. Gen. Laws ch. 265, § 13A (Victim 3); Assault & Battery by Means of a Dangerous Weapon, in violation of Mass. Gen. Laws ch. 265, § 15A (Victim 3); Rape of a Child Under 16, in violation of Mass. Gen. Laws ch. 265, § 23 (Victim 3) (2 counts); Assault and Battery Upon Another Who is Pregnant, in violation Mass. Gen. Laws ch. 265, § 13A(b)(ii) (Victim 2); Unlawful Possession of a Large Capacity Feeding Device, in violation of Mass. Gen.

Laws ch. 269, § 10(m) (7 counts); Possession of Ammunition No FID Card, in violation of Mass. Gen. Laws ch. 269, § 10(h) (2 counts); and Possession of Ammunition, in violation of Mass. Gen. Laws ch. 269, §§ 10(h), 10G, and 10G(a) (2 counts).

ii.    The Original Federal Charges.

On October 17, 2023, U.S. Magistrate Judge M. Page Kelley signed a criminal complaint charging Queen with Transportation of a Minor with Intent to Engage in Criminal Sexual Activity, which was based on Queen's efforts to transport Victim 1 between Massachusetts and Rhode Island to engage in commercials sex. ECF No. 1. On November 14, 2023, a federal grand jury returned an indictment charging Queen with Sex Trafficking of a Child and the Transportation count alleged in the criminal complaint. Both counts were based on Queen's efforts to cause Victim 1 to engage in commercial sex for his financial benefit. ECF No. 18.

iii.    Queen's First Request to Delay Trial.

On March 31, 2025, the Court set this case for trial to commence on October 20, 2025. ECF No. 72. However, at a hearing on May 16, 2025, defense counsel indicated that she was interested in postponing the trial. ECF No. 83.

On September 15, 2025, Queen's counsel filed an assented-to motion to continue trial "until a date in January 2026," citing, among other things, her difficulty preparing for trial while participating in an intervening state trial. ECF No. 93. Two days later, the Court entered an order allowing Queen's motion to continue trial, and setting trial for November 10, 2025, or January 12, 2026, if counsel would be unavailable for the November 10 date. ECF No. 94.

iv.    Queen's Second Request to Delay Trial.

On October 23, 2025, the government contacted Queen's counsel to inform her that during trial preparation the government had determined that it had sufficient evidence to prove that Queen

violated 18 U.S.C. § 2251(a) by using 17-year-old Victim 2 to create a visual depiction of Victim 2 engaged in sexually explicit conduct (i.e., CSAM production). Queen's counsel requested an opportunity to review the CSAM video and the cell phone extractions with the defendant. The government agreed to make the video and extractions of the defendant's cell phones available for the defendant and his counsel to review.

On October 27, 2025, a law enforcement officer and government counsel met with Victim 1. After the law enforcement officer gave Victim 1 an admonition based on the case of *Commonwealth v. German*, 134 N.E.3d 542 (Mass. 2019), Victim 1 viewed one of the CSAM production videos and identified Victim 2 and Queen as the people depicted in the video. Law enforcement had not previously shown that video to Victim 1. Government counsel disclosed this identification (and the procedure used) in an email to Queens' counsel about 3 hours after Victim 1 made the identification. Subsequently, the government produced a report containing that same information.

On October 28, 2025, Queen and his counsel reviewed the data extracted from his cell phones (including the CSAM production video that the government referenced in its call on October 23) at the U.S. Attorney's Office. While at the U.S. Attorney's Office, counsel for the government and Queen discussed the deadline for accepting a potential plea offer and the timing of trial. The government agreed to leave open the possibility of extending an offer for Queen to plead to the existing indictment until November 4, 2025. Queen then filed an assented-to motion to continue trial to January 12, 2026, the date the Court had previously reserved. On October 29, 2025, the Court allowed the defendant's motion and set trial to commence on January 12. ECF No. 135.

v.    <u>The Government Made a Plea Offer</u>.

On October 30, 2025, the government sent Queen's counsel a formal plea offer.    The proposed agreement contemplated, among other things, Queen pleading to the offenses in the original indictment, and the government agreeing not to charge Queen pursuant to 18 U.S.C. § 2251(a) based on the conduct underlying the crimes charged in this case that were then known to the U.S. Attorney.    The government indicated that the offer would expire on November 4, 2025. At a hearing on November 4, Queen informed the Court that he did not wish to accept the government's offer.    ECF No. 138.

vi.    <u>The Superseding Indictment</u>.

On November 13, 2025, a grand jury returned a superseding indictment that includes the charges alleged in the original indictment and adds two CSAM production counts, pursuant to 18 U.S.C. § 2251(a), which are based on videos that Queen used Victim 2 to create, and a CSAM possession count, pursuant to 18 U.S.C. § 2252A(a)(5)(B), which is based on other files depicting Victim 2 found on Queen's iPhone XR.

**B.    <u>Queen Sexually Exploited a Second Minor: 17-Year-Old Victim 2</u>.**

As early as October 2021, Queen engaged in sex acts with then-17-year-old Victim 2. Based on visual depictions recovered from Queen's cell phones, this included numerous acts of vaginal and oral sex.    And the acts were not simply intended for his sexual gratification.    He used the sexual abuse of Victim 2 to make money.    Based on text messages recovered from his phone, Queen repeatedly directed Victim 2 to record herself engaged in sex acts.    These recorded sex acts included Queen as well as sex buyers.    Queen obtained the proceeds of Victim 2's commercial sex acts and sought to distribute the various graphic depictions of 17-year-old Victim 2 engaged in sex acts.

### C.   Queen Expanded His Commercial Sex Operation By Recruiting Victim 1.

A few months after Queen had begun his serial exploitation of Victim 2, he expanded his operation, adding two other minor victims.  In or around mid-January 2022, Victim 3 introduced 16-year-old Victim 1 to Queen.  ECF No. 1-1 at 12.  Victim 3 told Victim 1 that the reason for the introduction was to "make money."  ECF No. 1-1 at 12.  Approximately three days after Victim 1 met Queen, the nature of his sex trafficking operation started to become apparent when Queen directed Victim 1 to take photos of herself.  ECF No. 1-1 at 12.  Some of these photos depicted Victim 1 topless, and for others, Queen directed Victim 1 to pose in a position that Queen described as "bent over, arched."  ECF No. 1-1 at 12.

### D.   Queen Directed Victim 1 to Engage in Commercial Sex.

After taking photos of Victim 1, Queen began directing her to have sex for money.  ECF No. 1-1 at 13.  Specifically, Queen would tell Victim 1 that she had a "play," which was the term that Queen and the victims used to describe a sex buyer or the actual commercial sex encounter with the sex buyer.  ECF No. 1-1 at 13.  Queen would then tell Victim 1 the basic information about the commercial sex encounter, including the price, the sex act she would need to perform, and where she would perform it.  ECF No. 1-1 at 13.  Queen directed Victim 1 to perform "in-calls," which was when Victim 1 would perform the commercial sex act in the basement of Queen's mother's house in Dorchester, Massachusetts.  E C F  N o . 1-1 at 13.

Queen would also direct Victim 1 to perform "out-calls."  ECF No. 1-1 at 13.  For out-calls, Queen would often have the sex buyer transport the victims to the sex buyer's location using a rideshare application, such as Uber.  ECF No. 1-1 at 13.  Once with the buyer, Victim 1 would perform the requested commercial sex act, which often included vaginal intercourse and/or oral sex.  ECF No. 1-1 at 14.  Sex buyers would pay for the sex acts by giving Victim 1 cash, which

Queen directed her to give him afterwards, or sending money directly to Queen via his CashApp account.  No. 1-1 at 16.

According to Victim 1, neighbors near Queen's mother's home eventually realized that there was prostitution activity occurring at the Dorchester home.  E C F  No. 1-1 at 17.  As a result, Queen had to move his sex trafficking operation.  ECF No. 1-1 at 17.  He cut off his court-ordered location monitoring device and had the victims continue performing commercial sex acts elsewhere, including in Rhode Island.  ECF No. 1-1 at 17.

### D.    <u>Queen Took Victims 1–3 to Rhode Island Hotels to Engage in Commercial Sex</u>.

On several occasions between mid-January 2022 and February 5, 2022, Queen drove Victim 1, Victim 2, and Victim 3 to Rhode Island to engage in commercial sex at hotels.  E C F No. 1-1 at 18.  Victim 1 identified the Holiday Inn in Warwick, Rhode Island as one of the locations where Queen ran his sex trafficking operation.  ECF  No. 1-1 at 18.  Person B, an adult female associate of Queen, would rent the hotel rooms.  ECF No. 1-1 at 19.  Holiday Inn Express records indicate that Person B rented a room at their Warwick location on February 4, 2022.  ECF  No. 1-1 at 20.  Hotel records also indicate that Person B checked into the hotel on the evening of February 4, 2022 and checked out the morning of February 5, 2022.  ECF No. 1-1 at 20.  Video surveillance recordings from the Holiday Inn depict Queen, Victim 3, and Person B near a vehicle.  ECF No. 1-1 at 21.  The recordings also depict Queen and Victim 3 standing with Person B as she checked in to the hotel on February 4, 2022.  No. 1-1 at 21.

### E.    <u>Boston Police Stopped Queen with 16-year-old Victim 1 on February 5, 2022</u>.

On February 5, 2022, Boston police officers saw a man driving a 2011 gray Ford Fusion with a license plate that was registered to another vehicle.  ECF No. 1-1 at 6.  When the officers

stopped the vehicle, they identified the driver as Queen and the two passengers as Victim 1 and Person A.  ECF No. 1-1 at 6.

Officers arrested Queen pursuant to outstanding state warrants.  ECF No. 1-1 at 7.  At the time of the arrest, there were two cell phones (one red and one black) plugged into a charger beside Queen on the unoccupied front passenger seat.  ECF No. 1-1 at 7.  Those devices and other items were collected and transported to the police station with Queen.  During an inventory search of the Ford Fusion, officers observed what appeared to be firearms under both front seats, which law enforcement later determined were blank guns.  ECF No. 1-1 at 8.  Officers also found a backpack in the backseat near Person A that contained another blank gun and a round of live ammunition.  ECF No. 1-1 at 8.  Subsequently, state court judges issued a series of warrants authorizing the seizure and search of two of the three cell phones in Queen's property bag: a red iPhone XR and a black iPhone 8.  ECF No. 1-1 at 10.

When law enforcement interviewed Victim 1 three days later, she disclosed that from mid-January 2022 through the date of the car stop, February 5, 2022, Queen caused her to engage in commercial sex.  ECF No. 1-1 at 11.  Victim 1 also disclosed that Queen was causing Victim 2 and Victim 3 to engage in commercial sex acts.  Victim 1 stated that she saw Queen physically abuse Victim 2, who was then pregnant with Queen's child.  ECF No. 1-1 at 11.

After the initial interview, law enforcement obtained data from Victim 1's cell phone.  No. 1-1 at 23.  This included screenshots and a partial extraction of data.  The phone contained extensive text messages between Victim 1 and Queen in which Queen directed Victim 1 to engage in commercial sex acts, including outside Massachusetts.  ECF No. 1-1 at 23.  For example, in an exchange on February 4, 2022, at approximately 5:19pm, Queen and Victim 1 discussed booking

a hotel room, consistent with Holiday Inn Express and video surveillance footage that demonstrate that Queen conducted his sex trafficking operation in Warwick, Rhode Island.  ECF No. 1-1 at 30.

### F.  **Queen Obstructed Justice on Multiple Occasions Since His Arrest.**

In November 2022, Queen was charged in Suffolk County Superior Court with various criminal offenses based on his efforts to cause Victim 1, Victim 2, and Victim 3 to engage in commercial sex acts for his financial benefit.  ECF No. 1-1 at 35.   Queen was held in custody at the Suffolk County Jail.  ECF No. 1-1 at 35.  While in custody, Queen used the inmate email system to direct Victim 2 to submit false information to the Suffolk County District Attorney's Office in an attempt to persuade prosecutors to dismiss the criminal charges then pending against him.  ECF No. 1-1 at 35.   In the messages to Victim 2, Queen also directed Victim 2 to instruct Victim 3 to provide false information to the Suffolk County District Attorney's Office.  ECF No. 1-1 at 35.  He also warned Victim 2 not to reveal the fact that he had spoken to the victims.  ECF No. 1-1 at 35.

On April 7, 2025, Queen again attempted to obstruct justice by using a friend to find and communicate with Victim 1 via social media.  Through jail calls from the Plymouth County Jail, Queen directed Person C to search for Victim 1 on Facebook.  Queen instructed Person C to tell Victim 1 that he wanted her to meet with his "private investigator," and subsequently tried to ingratiate himself to the minor victim, telling her "I do miss your goofy ass."  Person C sent the messages that Queen dictated.  Victim 1 received them and promptly reported to law enforcement that Queen had been attempting to contact her through social media.  The government subsequently informed Queen's counsel of his continued attempts to contact minor victims.  In an email to government counsel dated July 9, 2025, Queen's counsel "provide[d] assurances that there will not be any third-party attempts to get into communication with the victims, excepted through [an]

investigator."

On October 24, 2025, one day after government counsel specifically identified one of the CSAM production videos, Queen used a jail phone to call Victim 2, the minor victim depicted in the videos.[2]  In one call, Queen repeatedly suggests to Victim 2 that he was asleep during the creation of the CSAM video depicting him reclined with an erect penis and Victim 2 performing oral sex.  Queen's repeated suggestions about being asleep are inconsistent with the video, in that the video depicts Queen moving, participating in the sex act with his eyes open, and at one point trying to hide his face from the camera.  His unprompted repetition of a demonstrably false statement, a day after he learned that the government was focused on this video, supports the reasonable inference that he was trying to get Victim 2 to adopt his false statement.  In another call on October 24, Queen and Victim 2 generally discuss ways in which they hope to show that other people were using Victim 1's cell phone during the relevant period.

On October 31, government counsel sent Queen's counsel the aforementioned October 24 recordings, a description of the calls, and the government's conclusion that the calls constitute obstruction.  Queen's counsel deny that Queen's October 24 calls constitute obstruction.

### The Legal Standard

#### A.    Prosecutorial Vindictiveness.

There is no evidence to support Queen's claim that he is the victim of prosecutorial vindictiveness.  United States District Judge Gorton framed the proper inquiry for this type of allegation in *United States v. George*, 839 F. Supp. 2d 430 (D. Mass. 2012).  There, the court stated:

> To establish prosecutorial vindictiveness, a defendant must show
> that the prosecutor harbored genuine animus toward him and that he

---

[2] Queen called a third party and directed that person to conference in Victim 2.

would not have been prosecuted but for that animus. A defendant who lacks direct evidence of a vindictive motive can establish a rebuttable presumption of vindictiveness by demonstrating circumstances that reveal a sufficient likelihood of vindictiveness. *Raising such a presumption is especially difficult in a pretrial setting*, however, given that a prosecutor is afforded broad discretion to determine whom should be prosecuted and for what crime and is presumed to have exercised that discretion in good faith.

*George*, 839 F. Supp. 2d at 441 (citations omitted) (emphasis added).

The burden of raising a pretrial presumption is even heavier in the context of plea negotiations. *See, e.g., Bordenkircher*, 434 U.S. at 359–363. In *Goodwin*, the Supreme Court carefully distinguished pretrial and post-trial procedures and discussed the "good reason to be cautious" before adopting a per se presumption of prosecutorial vindictiveness in a pretrial context. 457 U.S. at 381–82. The Court explained that, while preparing for trial, a prosecutor might uncover additional information suggesting a further basis for prosecution—or may simply realize his evidence has greater significance. *Id.* The Court recognized the unlikelihood that a prosecutor had fully "crystallized" his assessment of the case in its early stages, unlike when a trial had already begun or when a conviction had already been delivered. *Id.* The Court noted that prosecutors reasonably expect defendants to bring pretrial motions and exercise other procedural rights. *Id.* Thus, it is unrealistic to assume that a prosecutor's changed charging decision, including bringing new charges, is designed to punish and deter. *Id.* "A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution," the court held. *Id.* at 382. "An initial decision should not freeze future conduct." *Id*.

The First Circuit and other appellate courts have more recently reaffirmed these principles—namely, that a presumption of vindictiveness almost never applies in a pretrial setting and that new charges alone don't raise one. *See United States v. Jenkins*, 537 F.3d 1, 3-5 (1st Cir.

2008) (affirming rejection of vindictive prosecution claim where government filed § 851 information after the defendant rejected plea offer); *United States v. Stokes*, 124 F.3d 39, 45 (1st Cir. 1997) ("courts should go very slowly in embracing presumptions of prosecutorial vindictiveness in pretrial proceedings."); *Young*, 955 F.2d at 108 ("the mere bringing of a new indictment with added counts is not in itself vindictive behavior, nor does it raise a presumption of vindictiveness."); *cf. Cooper*, 461 F.3d at 856 (the "presumption of vindictiveness does not apply to pretrial decisions by the prosecution"); *see also United States v. Stanley*, 928 F.2d 575, 579 (2d Cir. 1991) ("The Supreme Court has made clear that threatening to bring otherwise legitimate charges to induce a defendant to accept a plea bargain 'no more than openly present[s] the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he [is] plainly subject to prosecution.") (quoting *Bordenkircher*, 434 U.S. at 365 and citing *Goodwin*, 457 U.S. at 377-80).[3]

In the extremely rare instance that a pretrial presumption of vindictiveness is found, the government may rebut it by demonstrating that the new charge has been brought for some other reason. *Goodwin*, 457 U.S. at 376 n.8. For instance, new evidence and obstruction are some legitimate, non-vindictive reasons for bringing a new charge. *Id.* (citing *Blackledge v. Perry*, 417 U.S. 21, 29 (1974)); *see also United States v. Marrapese*, 826 F.2d 145, 149 (1st Cir. 1987) ("Were

---

[3] *See also United States v. Ray*, 899 F.3d 852, 860-61 (10th Cir. 2018) (affirming rejection of vindictive prosecution claim where government superseded to add counts that could have been in the original indictment and doing so after the defendant declined a plea offer and filed pretrial motions), *cert. denied*, 139 S. Ct. 1206 (2019); *United States v. Watson*, 400 Fed. Appx. 442, 445 (11th Cir. 2010) (affirming rejection of vindictive prosecution claim where government superseded to add more serious charges after defendant declined plea offer, holding that those "facts, without more, do not give rise to a presumption of vindictiveness.") (unpublished); *see also United States v. Mincy*, No. 24-4019, 2025 U.S. App. LEXIS 30974, at *20–21 (6th Cir. Nov. 24, 2025) ("It is no surprise, then, that nearly every other circuit refuses to apply a presumption of vindictiveness in the pretrial context.") (collecting cases).

the presumption nevertheless to apply to this case, the prosecutor's explanation of the changed circumstances that led to the obstruction of justice charge would rebut any likelihood of vindictiveness.").

**B.      Discovery Regarding Vindictive Prosecution Claim.**

In order to obtain discovery, a defendant must "advance some evidence tending to establish his vindictive-prosecution claim." *Bucci*, 582 F.3d at 113. "In light of the presumption that a prosecutor has acted in good faith in exercising his discretion in making charging decisions, courts require a defendant seeking discovery first to come forth with 'some' objective evidence tending to show the existence of prosecutorial vindictiveness." *Id.*

In *Bucci*, the First Circuit described what is *not* sufficient evidence to authorize discovery. There, the defendant alleged the government returned a second superseding indictment, adding additional offenses and the defendant's mother as a defendant, to retaliate against him for engaging in First Amendment-protected activity by operating a website that purported to expose government informants. *Id.* at 112–13. The Court held that notwithstanding the timing of the second superseding indictment, law enforcement officer's public statements regarding their concern about the danger posed by the defendant's website, and the fact that the government had sufficient evidence to bring the new charges earlier in the case, Bucci had failed to make a sufficient showing to authorize discovery regarding alleged vindictiveness. *Id.* at 113–14 ("Assuming that the Government had enough evidence to indict Bucci initially on the increased charges, this fact alone is insufficient to establish that the Government later filed the superseding indictments to punish Bucci for [operating the website].") (citing *United States v. Roach*, 502 F.3d 425, 444–45 (6th Cir. 2007) (rejecting argument that the fact that the Government could have brough charges initially, but did not do so, indicated the prosecutor's vindictiveness), *cert. denied*, 553 U.S. 1006 (2008)).

### C.    **Disclosure of Grand Jury Material**.

The Court may authorize disclosure of grand jury materials "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). "Only a 'compelling necessity' warrants a review of grand jury proceedings." *Fontanez*, 2023 U.S. Dist. LEXIS 141256, at *40 (citing *United States v. Capozzi*, 486 F.3d 711, 727 (1st Cir. 2007) (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958)); *see also United States v. Rodriguez-Torres*, 570 F. Supp. 2d 237, 241 (D.P.R. 2008) (noting that Rule 6(e) "is not an invitation to engage in a fishing expedition to search for grand jury wrongdoing and abuse when there are no grounds to believe that any wrongdoing or abuse has occurred").

The Supreme Court has held that failure to present exculpatory information to a grand jury is not a basis to dismiss an indictment. *See Williams*, 504 U.S. at 51–55 (reversing dismissal of indictment for failing to present exculpatory evidence to the grand jury, holding that "requiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body"); *see also Fontanez*, 2023 U.S. Dist. LEXIS 141256, at *42 (stating "the Supreme Court has held that courts cannot impose a duty upon prosecutors to disclose exculpatory evidence to the grand jury").[4]

---

[4] The government acknowledges that "[i]t is the policy of the Department of Justice . . . that when a prosecutor conducing a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such person." Justice Manual, § 9-11.233. However, even an alleged violation of this Justice Department policy does not provide a basis for dismissing an indictment.

### D.      The Adam Walsh Child Protection and Safety Act, 18 U.S.C. § 3509(m).

"In any criminal proceeding, any property or material that constitutes child pornography (as defined by section 2256 of this title) shall remain in the care, custody, and control of either the Government or the court."  18 U.S.C. § 3509(m)(1).  "Notwithstanding Rule 16 of the Federal Rules of Criminal Procedure, a court shall deny, in any criminal proceeding, any request by the defendant to copy, photograph, duplicate, or otherwise reproduce any property or material that constitutes child pornography (as defined by section 2256 of this title), so long as the Government makes the property or material reasonably available to the defendant."  18 U.S.C. § 3509(m)(2)(A). "[P]roperty or material shall be deemed to be reasonably available to the defendant if the Government provides ample opportunity for inspection, viewing, and examination at a Government facility of the property or material by the defendant, his or her attorney, and any individual the defendant may seek to quality to furnish expert testimony at trial."  18 U.S.C. § 3509(m)(2)(B); *see also United States v. Shrake*, 515 F.3d 743 (7th Cir. 2008) (rejecting First, Fifth, and Sixth Amendment challenges to § 3509(m)).

### Argument

### A.      The Court Should Deny Queen's Requests for Correspondence Regarding CSAM (No. 3) and Copies of Grand Jury Material (No. 6) Because Neither the Facts Nor the Applicable Law Support His Requests.

Queen makes an allegation of misconduct with no evidence to support it.  Unhappy with the government's continuing investigation of his sexual exploitation operation, Queen has decided to fish for evidence that the government did something improper.  However, the claimed bases for his vindictive prosecution claim, even if true, do not enable him to satisfy the high burden of production to authorize discovery.

Queen requests "any correspondence between any investigators and any prosecutors indicating the presence of [CSAM] on either of the two iPhones attributed to Mr. Queen, including

the identification of any specific files." ECF No. 150 at 5. Queen says he is entitled to this material because it will show that prosecutors "knew of the videos for a long period of time." *Id.* at 6. However, the Supreme Court, the First Circuit, and other courts have held that this is not a basis for a vindictive prosecution claim. Indeed, in *Bordenkircher*, a case in which prosecutor possessed the evidence to support the added charges at the outset and superseded after the defendant declined a plea offer, the Court rejected a vindictive prosecution claim, holding "[w]hile confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable'— and permissible—'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.'" 434 U.S. at 364 (citation omitted)*; see also Jenkins*, 537 F.3d at 3–5 (affirming rejection of vindictive prosecution claim where government filed § 851 information after the defendant rejected plea offer); *Young*, 955 F.2d at 108 ("the mere bringing of a new indictment with added counts is not in itself vindictive behavior, nor does it raise a presumption of vindictiveness sufficient to require investigation of grand jury minutes."). Because correspondence—even if they exist—would not provide a basis for the relief he seeks, he is not entitled to them. And the government urges the Court to decline to take the drastic step of ordering disclosure of internal government correspondence based on an unsupported allegation that, even if true, would not support a vindictive prosecution claim as a matter of law.

Queen also requests disclosure of grand jury material based on pure speculation about what occurred before the grand jury. *See, e.g., Young*, 955 F.2d at 108 (affirming denial of request for grand jury material). The government complied with its obligations imposed by law and Department policy. The problem with Queen's request is that even if Queen guessed correctly about what happened before the grand jury, and the government failed to disclose actual

exculpatory evidence to the grand jury, such a failure is not a basis for a motion to dismiss. *Williams*, 504 U.S. at 51–55 (holding that the Court may not impose upon the government an obligation to present exculpatory information to the grand jury); and *Fontanez*, No. 19-10421-DJC, 2023 U.S. Dist. LEXIS 141256 at \*40–42.  Accordingly, it is not a basis for disclosure under Rule 6(e)(3)(E)(ii).  And the Court should deny the motion.

Moreover, the Court should reject Queen's additional efforts to accuse the government, without evidence, of engaging in a so-far unidentified "pattern of vindictive acts aimed to punish the defendant for insisting upon a trial."  ECF No. 150 at 7.  By repeating conclusory allegations without evidentiary support, Queen moves no closer to satisfying the "'some' objective evidence" standard the First Circuit articulated in *Bucci*.  582 F.3d at 113 (citations omitted); *see also United States v. Sutherland*, 929 F.2d 765, 772 n.2 (1st Cir. 1991) (noting that conclusory allegations are insufficient when the record lacks any competent evidence of vindictiveness) (citations omitted).

### B.    The Court Should Deny Queen's Request for Information Regarding Identification of Persons Other Than the Defendant (No. 1).

The Court should deny Queen's request for an order requiring the government to disclose "other identification procedures wherein Victim 1 identified herself or a third party in a picture or video where the government intends to present that identification at trial."  ECF No. 150 at 4. Queen fails to cite authority requiring such disclosure and the government cannot produce documents that are not in its possession, custody, or control.

First, Queen has cited no authority, other than Rule 16(a)(1)(E)'s general categories of mandatory disclosure, to support his request for information about how Victim 1 identified herself and people other than the defendant.  While there is well-developed case law on the admissibility of evidence of a witness's identification of the defendant, Queen cites no authority to support the need for additional disclosures regarding third-party or self-identification evidence.  *See United*

*States v. Henderson*, 320 F.3d 92, 99-102 (1st Cir. 2003) (applying First Circuit's two-part test for out-of-court identification of the defendant).

Second, the government has produced reports regarding Victim 1's statements as well as an audio recording (and transcript thereof) of Victim 1's initial comprehensive interview. Other than what has already been produced, the government is not aware of reports providing additional information about Victim 1's self-identification or the identification of people other than the defendant.[5] If the government obtains or creates other such reports, it will produce them. However, in the absence of additional documents, Fed. R. Crim. P. 16 imposes no obligation to create new reports for the defendant on this subject.

### C.    The Court Should Authorize the Government's Proposal for Queen's Copying of Non-CSAM Data (No. 7).

The government requests that the Court deny Queen's request for unfettered access to the CSAM-containing cell phone data extractions because doing so would violate 18 U.S.C. § 3509(m). For good reason, Section 3509(m) prohibits the government from permitting the copying or transfer of CSAM materials beyond authorized government facilities and personnel. Authorizing Queen's counsel and investigator, unilaterally and without oversight, to copy and obtain any data they wish prevents the government from fulfilling its statutory duty to safeguard images of child sexual abuse. *See* 18 U.S.C. § 3509(m). Accordingly, the Court should deny the request.

The government's alternative proposal provides Queen's counsel with continued access to the electronic evidence and an opportunity to obtain copies of any non-CSAM material for use at

---

[5] In response to Queen's counsel's request on October 21, 2025, the government assured defense counsel that before Victim 1 testifies, the government would identify the specific photos the government expects Victim 1 to identify during her direct examination.

trial. Counsel and/or investigator may visit the FBI to select and copy the data. However, pursuant to Section 3509(m), the government must have some way to ensure that counsel and/or the investigator do not obtain copies of the CSAM. This is especially true when doing so may be inadvertent. Therefore, the government proposes that counsel and/or their investigator permit an FBI agent or task force officer to review the selected data merely to confirm that it does not include CSAM.

## Conclusion

For the foregoing reasons, the government respectfully requests that the Court deny, in part, and grant, in part, defendant Tramonte Jamier Queen's motion to compel discovery.


Respectfully submitted,

LEAH B. FOLEY
United States Attorney


By:    /s/ Brian A. Fogerty_____
       BRIAN A. FOGERTY
       JESSICA L. SOTO
       Assistant United States Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

/s/ Brian A. Fogerty
BRIAN A. FOGERTY
Assistant United States Attorney

Date: December 1, 2025